### ATLANTIC COAST LINE RAILROAD CO. v. BAKER
(141 S. E., 688)

Rehearing Denied Nov. 26, 1927

1. EVIDENCE—TESTIMONY IN PROCEEDINGS, TO WHICH NEITHER DEFENDANT NOR HER GRANTORS WERE PARTIES, AS TO RAILROAD RIGHT OF WAY DEED, DESTROYED BY FIRE, HELD INADMISSIBLE.—In action to restrain trespass on railroad right of way by erection of building, testimony in proceedings, to which neither defendant nor her grantors were parties, that plaintiff's predecessors received deed for 200-foot right of way, but that record thereof and deed itself were destroyed by fire, *held* inadmissible as against defendant.

NOTE: As to what is proper remedy for interference with railroad right of way, see annotation in 47 A. L. R., 563.

2. Statutes—Certified Copy of Foreign Statute Held Admissible to Show Width of Railroad Right of Way (Priv. Acts N. C. 1856–57, c. 66, § 10).—In action to restrain trespass on railroad right of way by erection of building, copy of Priv. Acts N. C. 1856–57, c. 66, certified by secretary of state, and under state's official seal, *held* admissible to show width of right of way, under Section 10, as against objection that such act could be proved only by its custodian's testimony.

3. Adverse Possession—Evidence Held Insufficient to Show Adverse Possession by Either Party to Action to Restrain Erection of Building on Railroad Right of Way.—In action to restrain trespass on railroad right of way by erection of building, evidence *held* insufficient to show adverse possession of disputed land in either party.

4. Railroads—Railroad Right of Way Held to Start From Junction with Intersecting Railroad's Right of Way, so as to Exclude Property Outside Latter (Priv. Acts N. C. 1856–57, c. 66, § 10).—Right of way 100 feet from center on each side, granted to Cheraw & Coal Fields Railroad Company by Priv. Acts N. C. 1856–57, c. 66, § 10, *held* to start from point where such railroad entered 130-foot right of way of Cheraw & Darlington Railroad, so as not to include property, on which building was sought to be erected by another, outside latter railroad's right of way.

5. Railroads—Evidence Held not to Show that Railroad, Seeking to Restrain Erection of Building, Acquired Land Otherwise Than by Charter Granting Right of Way Excluding Such Land.—In action to restrain trespass on railroad right of way by erection of building, evidence *held* not to show that plaintiff acquired land involved in any other way than by its charter granting right of way, not including such land.

Before Dennis, J., Chesterfield, July, 1925. Affirmed.

Action by the Atlantic Coast Line Railroad Company against Rachel Baker. From a decree of dismissal, plaintiff appeals.

The Master's report, ordered incorporated in the report of the case, is as follows:

The above-entitled case was referred to me by the order of his Honor, Judge E. C. Dennis, dated the 25th day of October, 1924. This order provides that all issues arising herein are referred to me, save and except the issue of estoppel, as that issue is to be tried by a jury.

Accordingly, I have held several references at which I was attended by Pegues & Murray, attorneys for plaintiff, and R. E. Hanna and George K. Laney, attorneys for defendant. The testimony is reported herewith.

The plaintiff brings the action to restrain a continuing trespass upon what is alleged to be its right of way; the complaint alleging, in substance, that the Cheraw & Coal Fields Railroad Company was chartered by Act of the South Carolina Legislature in 1857, and that by the law of its creation said road was to have a right of way 200 feet wide, that is to say, 100 feet wide from the center of the track on each side, and that, in the absence of contract, there was to be a conclusive presumption of a grant two years after the construction thereof. It is also alleged that in 1868 the charter of said Cheraw & Coal Fields Railroad Company was amended, and the name changed to Cheraw & Salisbury Railroad Company; that subsequently all of the franchises, rights of way, and property of Cheraw & Salisbury Railroad were sold under foreclosure proceedings and bid in at such sale by Cheraw & Darlington Railroad Company, and that the latter company became the owner thereof; that subsequently Cheraw & Darlington Railroad Company was consolidated with and into Atlantic Coast Line Railroad Company, plaintiff herein; that the defendant, Rachel Baker, is trespassing upon the right of way of plaintiff (formerly Cheraw & Salisbury right of way) in a manner inconsistent with the use of said right of way for railroad purposes; that, although warned and forbidden to do so, the defendant has treated such warnings with defiance, and is attempting to erect a building on the right of way, for use as a garage and filling station; that such trespass is of a continuing nature; that defendant is utterly insolvent; and that the remedy at law is inadequate. The complaint, which is duly verified, prays for an injunction restraining the erection of such building.

The answer of the defendant, which is also duly verified, denies specifically the various incorporations alleged in the complaint, and also denies specifically the acts of the South Carolina and North Carolina Legislatures, and denies that she is trespassing on the property of plaintiff. The defendant also alleges that she, "her predecessors in interest and grantors have been, for more than ten years prior to the commencement of this action, in the open, notorious, adverse, and exclusive possession of the land upon which said trespass is alleged, and that the plaintiff has never been legally seized or possessed of the land upon which it is alleged the defendant is trespassing for ten years prior to the commencement of this action, and that neither the plaintiff, its predecessors, nor its grantors have been seized or possessed of this land for a period of 20 years prior to the commencement of this action; that the defendant, her predecessors and grantors, have been in the open, adverse, notorious, and exclusive possession of the same for a period of more than 20 years, etc.; that the defendant, her predecessors and grantors, have for a period of more than 20 years openly, notoriously, and adversely occupied the land in question on which there have been houses occupied by tenants of the owner and the owners; that plaintiff is estopped to deny the title of the defendant to the lot in question by reason of the admissions and acts of the plaintiff and its agents, which acts consisted in the location of the limits of the right-of-way of plaintiff at the outer boundary of the defendant's lot; that, if the plaintiff, or its grantors or its predecessors, have ever been seized of the property in question, which the defendant denies, by reason of laches and nonuse of the property in the face of adverse, open, notorious, and exclusive holding by the defendant, her predecessors and grantors, by reason of the terms of any title claimed by the plaintiff and its predecessors and the Statutes applicable thereto, the plaintiff has no title or interest in the property in question.

Such, in the main, are the issues to be decided, except, of course, the issue of estoppel, with which I have nothing to do.

After hearing the testimony and the arguments of counsel, as I view the case, the first question to be decided is, Did the plaintiff, or its predecessor, acquire a right-of-way 100 feet wide from the center of the tract, at the point where this garage building of defendant is located?

Plaintiff served notice on defendant to produce the various acts of the South Carolina Legislature, chartering Cheraw & Coal Fields Railroad Company, Cheraw & Darlington Railroad Company, the act of the Legislature amending the charter of Cheraw & Coal Fields Railroad Company, and changing the name to Cheraw & Salisbury Railroad Company. The defendant did not produce said acts. It was admitted that W. P. Blackwell, Secretary of State of South Carolina, if present, would testify that, owing to a fire which occurred in the office of Secretary of State some years ago, there are no original acts in that office prior to 1890.

This being so, I rule that the bound volumes of the Statutes, purporting to be published by authority of the Legislature, and printed by the State Printer, are the next highest evidence, and I admitted same.

Plaintiff then offered the Act incorporating Cheraw & Coal Fields Railroad Company (Act 1857, 12 St. at Large, p. 645). There is no necessity of setting out this Act in full. It simply incorporates the Cheraw & Coal Fields Railroad Company, and provides that its road be built "from the town of Cheraw to * * * the North Carolina line." Section 6 of said Act provides: "That the company hereby incorporated, when organized, and the stockholders and the president and directors thereof, shall have all the same powers, rights and privileges, and be subject to the same liabilities, except as herein otherwise enacted, as are provided by the aforesaid charter granted by the General Assembly of the

State of North Carolina to the aforesaid coal fields and South Carolina Railroad Company, and to the stockholders and president and directors thereof."

Plaintiff next put in the Act of 1861 (13 St. at Large, 79), amending the charter of Cheraw & Coal Fields Railroad Company. This Act need not be set out here, as it merely provides for a change of commissioners, except that, for reasons which will appear hereafter, I deem it advisable to set out Section 2 of same, which is as follows: "That the company chartered by said Act, when organized, and the president and directors thereof, shall, in addition to the powers, rights and privileges granted by said Act, have all the powers, rights and privileges, and be subject to the same liabilities, except as otherwise specially provided for, as are conferred and imposed by the amendments to the charter of the Cheraw & Coal Fields Railroad Company, by an Act entitled, 'An Act to revive and continue in force an Act entitled "An Act to incorporate the Cheraw & Coal Fields Railroad Company," ' passed by the General Assembly of the State of North Carolina, at the session of 1856–57, Chapter 66, ratified on the thirteenth day of September, 1861."

The plaintiff next put in the Act of 1868 (14 St. at Large, 80). This Act reaffirms the charter, but amends same by changing the name from Cheraw & Coal Fields to Cheraw & Salisbury Railroad Company, and need not be set out.

The plaintiff next offered in evidence certified copy of the Act of the State of North Carolina of 1857 (Priv. Laws 1856–57, c. 66), incorporating Cheraw & Coal Fields Railroad Company; same being certified by the Secretary of State of North Carolina, and under the official seal of State. The defendant objected to the introduction of the certified copy of this Act on the ground that the only way same could be proved was to bring the custodian of the Acts of that State here to testify, or else take his testimony. I overruled this objection, for the reason that notice to produce

the original had been served on the defendant, and certainly the original of this public Act of a sister State could not be brought here for the purpose of this reference, and, in the absence of a specific attack on same, that the copy of the Act certified by the Secretary of State and under official seal of the State was admissible.

This Act is very voluminous, but, inasmuch as plaintiff relies on Section 10 of same in its proof of title, I deem it advisable to set out that Section in full, as follows: "Section 10. Be it further enacted, that in the absence of any written contract between the company and any owner or owners of said land, through which the said railroad may be constructed, in relation to said land, it shall be presumed that the land upon which the said railroad may be constructed, together with one hundred feet on each side of the center of said road, has been granted to the said company by the owner or owners thereof, and the said company shall have good right and title to the same, and shall have and hold and enjoy the same unto them and their successors so long as the same may be used only for the purpose of said road, and no longer, unless the person or persons to whom any right or title to such lands, tenements or hereditaments descend or come, shall prosecute a suit for the same, within two years next after the construction of such part or portion of said road, as may be constructed upon the lands of the person or persons so holding or acquiring such right to the title as aforesaid; and if any person or persons, to whom any right or title to said lands, tenements, or hereditaments belong, or shall hereafter descend, or come, do not prosecute a suit for the same, within two years next after the construction of the part of said road upon the lands of the person or persons so having or acquired said right or title as aforesaid, then he or they, and all claiming under him or them, shall be forever bound to receive the same: *Provided,* That nothing herein contained shall affect

the rights of femes covert, infants (or) persons *non compos mentis."*

Plaintiff next offered in evidence the judgment roll No. 1596, in the case of *Theodore G. Baker et al., Trustee, v. Cheraw & Salisbury Railroad Company.* This was an action to foreclose a mortgage given by the railroad company to secure its bond issue. The proceeding appears regular in every way. Under this proceeding all property, including franchises, rights-of-way, rolling stock, etc., of Cheraw & Salisbury Railroad Company were ordered to be sold by the Clerk of Court of Chesterfield County. Plaintiff next offered in evidence the following deeds: W. J. Hanna, Clerk of Court, to Cheraw & Darlington Railroad Company, dated November 30, 1892, recorded in the office of the Clerk of Court for Chesterfield County in Book.11, pp. 634–637; also deed from W. J. Hanna, Clerk of Court, and Theodore G. Baker et al., trustee, and Cheraw & Salisbury Railroad Company, to Cheraw & Darlington Railroad Company, conveying the same property as the former deed, this last deed being dated 12/22/1892, and recorded in the office of Clerk of Court of Chesterfield County in Deed Book 11, pp. 667–669, Exhibits C and D.

The plaintiff next put in the Act of 1897 (22 St. at large, p. 653), whereby the General Assembly of South Carolina authorized the Cheraw & Darlington Railroad Company and other roads to consolidate and form the Atlantic Coast Line Railroad Company of South Carolina, which is chartered by said Act. Then the certified copy of the consolidation agreement of 1898, whereby Cheraw & Darlington Railroad Company and other companies were consolidated into Atlantic Coast Line Railroad Company, was admitted in evidence. This copy is certified by the Secretary of State, under official seal.

Plaintiff also put in evidence consolidation agreement whereby Atlantic Coast Line Railroad Company of South Carolina is consolidated in the Atlantic Coast Line Rail-

road Company by Act of 1900, under certificate and seal of the Secretary of State.    Exhibit G.

Plaintiff asked that the Court take judicial notice of the Act of the General Assembly of 1901, which provides generally for the consolidation of railroad companies, same being 23 St. at Large, p. 717.

Consolidation agreement whereby Savannah, Florida & Western Railroad Company and Atlantic Coast Line Railroad Company are consolidated into Atlantic Coast Line Railroad Company.    Exhibit H.

Application for charter of Atlantic Coast Line Railroad Company, certified by W. P. Blackwell, Secretary of State, in evidence Exhibit J, consolidation agreement in evidence Exhibit I.    Act of 1902 (24 St. at Large, p. 324 , chartering Atlantic Coast Line Railroad Company under the laws of South Carolina in evidence.

*The reason I have carefully set out here the different acts, deeds, and consolidation agreements is that plaintiff relies on same as proving its title to the right of way in question.*

The Supreme Court of this State has several times held that, under express provisions of the charters, railroads acquire a right-of-way 100 feet wide, in the absence of a written contract.

In *Harman v. Southern Ry.,* 72 S. C., at p. 234; 51 S. E., 691, in considering the question as to a right-of-way, and the width conveyed by a deed, the Court said, among other things:

"The charter of the Greenville & Columbia R. R. Co., 11 Stat. 348–356.    The eleventh Section of this charter (Act 1845, 11 St. at Large, 352) reads as follows: 'That in the absence of any written contract between the said company and the owner or owners of land, through which the said railroad may be constructed, in relation to said land, it shall be presumed that the land upon which the said railroad may be constructed, together with one hundred feet on each side of the center of said road, has been granted to the said com-

pany by the owner or owners thereof, and the said company shall have good right and title to the same, etc.'

"In reply, the plaintiff, Harman, testified that he never had any knowledge or notice of the deed from L. E. Folk to the Greenville & Columbia Railroad Company cencerning the right-of-way.

" 'It also appeared in evidence, in reply, that this deed had never been recorded.'

"The jury rendered a verdict in favor of the defendant, and the plaintiff appealed upon exceptions, which will be incorporated in the report of the case.

"Our construction of the deed is, that it was the intention of the grantor to convey such rights, to the full extent, *as the railroad company would be presumed to have acquired, under the Statute, in the absence of a written contract, between the company and the owner of the land, through which the railroad was constructed.* The plaintiff cannot be regarded as a purchaser for valuable consideration without notice of the railroad company's right-of-way, because he had actual notice that the railroad was being operated through said land, at the time of his purchase, *and he had constructive notice, or is presumed to have known, that the company's right-of-way, in the absence of a written contract, extended one hundred feet on each side of the center of its track."* (Italics mine.)

Again: "The presumption was that the plaintiff, or its predecessors, took one hundred feet on each side from the center of the track." *Southern Ry. v. Gossett,* 79 S. C., 381; 60 S. E., 956.

The case of *Southern Ry. v. Howell,* 79 S. C., 281; 60 S. E., 677, also holds that, under express terms of the charter, in the absence of a written contract with the landowner, the railroad is presumed to have acquired a right-of-way 100 feet wide from the center of the track on each side.

There are other authorities to the same effect, but I do not consider it necessary to set them out. And I hold that, under the express terms of its charter, and the amendments thereto, in the absence of a written contract with the adjoining landowners, the Atlantic Coast Line Railroad Company or its predecessor, Cheraw & Salisbury Railroad Company, acquired a right-of-way of 100 feet wide from the center of its track on each side.

The defendant urged in opposition to this that such provision as a presumption of a grant to a right-of-way is not found in the Acts of South Carolina, and appears only in the Act of the State of North Carolina incorporating Cheraw & Coal Fields Railroad Company. And that the Legislature of South Carolina, by providing that "the company when organized" shall have "all the rights, powers and privileges as are granted by the Act of North Carolina" etc., could not give effect to the North Carolina Statute in this State. Defendant cited no authorities in support of this proposition. Every presumption must be indulged in favor of an Act of the General Assembly. *Trustees of University of South Carolina v. Trustees of Academy of Columbia,* 85 S. C., 546; 67 S. E., 951.

It seems to me that the Legislature would have the power to confer all rights, powers, and privileges as are granted by the Act of North Carolina, unless prohibited from doing so by the Constitution, and no such limitation on the Legislative power has been called to my attention, and, as every presumption should be resolved in favor of an Act of the Legislature, I hold that the Legislature had such power, and that by its Act Cheraw & Coal Fields Railroad Company, afterwards Cheraw & Salisbury Railroad Company, is presumed to have acquired this right-of-way. That part of the North Carolina Act which provides for a presumption of a grant to a right-of-way is almost identical in language to several Acts of the South Carolina Legislature which the Court had under consideration in *Harman v. Railway,*

16—S. C. R.

*supra; Columbia, Newberry & Laurens R. R. Co. v. Laurens Cotton Mills, supra;* and *Southern Ry. v. Howell, supra.*

Another objection to the presumption of a grant to a right-of-way which defendant urged is that such presumption does not arise where there were houses, or inclosed yards, there when the railroad was constructed; that it will not be presumed that the company took the house or broke into the fencing and acquired the land—this contention being supported by the case of *Atlantic Coast Line R. R. Co. v. Dawes,* 103 S. C., 507; 88 S. E., 286, which holds, to quote the syllabus: "Although a railroad charter allows a given number of feet on either side of the track, no presumption of ownership of that number of feet arises as against land inclosed within the yard, dwelling house, garden, or graveyard of a citizen, but the burden is on the railroad to show that the then owner of such land consented to the use by the road of his land."

The contention of defendant is that the evidence shows that there was a house that stood about where the garage building of Mrs. Baker is now being built; that that house was there when the railroad was built; that it had a fence around it; and that there is no presumption that the railroad acquired the land inclosed by the fence or occupied by the house.

Before going into this question, I think that it would be proper for me to state that both sides are laboring under difficulties here in trying to prove events occurring back in the '60's and '70's. The courthouse at Chesterfield was burned by the invading Union Army in 1865, and such records as it contained in reference to the Cheraw & Coal Fields or Cheraw & Salisbury Railroad Company were destroyed.

The only evidence offered by the defendant as to this old house being there, with an inclosed yard, was the testimony of Wash Wingate. The testimony of this witness on this point appears in the minutes of reference of December

19th, at page 9, as follows: "Q. When, Uncle Wash, was that dwelling put there, if you know? A. I don't know, sir. It was put there a long time ago. Q. Was it put there before the railroad was built there? A. Yes, sir; part of it was right there."

And on cross-examination (page 10) this witness testified as follows: "Q. Do you know whether or not the house was originally put there by the railroad company? A. I don't know who put it there."

In the minutes of reference of December 31st, at page 5, this witness testified to the same point, as follows: "Q. At the time that roadbed was built along there, was or not that old double house standing there? A. I think it was. I wouldn't be certain, but it was an old house then."

This witness, Wingate, was the only witness sworn by defendant on this point. This witness was asked on cross-examination if he remembered, when the road was first built, that this double house was the railroad office, but he stated that he did not remember that, nor did he remember that the building was afterwards occupied by the section hands of the railroad company.

Plaintiff swore but one witness on this point also, the witness, Beverly Bass, who testified substantially: That he remembered when Cheraw & Salisbury Railroad was built. That the double house was there when he went to work for the railroad, and they must have built it, as he helped to fix it up for a railroad office. Afterwards the house was used. as a shanty house for railroad employees. It stood there by itself with no other house close to it for a number of years. There was a little fence between the house and the railroad, but the company tore it down. That he worked for the railroad for 20 years. That subsequently this house was taken up by the railroad company, and moved over Thompson's creek.

In the case of *Atlantic Coast Line Railroad Co. v. Dawes, supra,* the railroad company had not entered the yard nor the

house, and it claimed that by lapse of time it would be presumed to have acquired it under the charter. The Court says, at page 510 (88 S. E., 287): "Plaintiff cannot contend that consent can be presumed by lapse of time. The presumption is they acquired what they have been using and all of that part of the yard, garden, and dwelling house that they claim, but in order to get the excepted part made so by Statute, they must show their right by agreement, or satisfying evidence of the existence of the right claimed. *Until the plaintiff attempted to assert the right claimed by them to the property in dispute and go in the yard, the owner could sit quiet and do nothing.* Until plaintiff moved, the defendant was not required to act. *There was an inhibition against invading the yard, garden, and dwelling house under the charter, and, until an attempt was made to do so, it was not incumbent on the defendant to act."* (Italics ours.)

The case at bar is to be differentiated from the *Dawes case,* for the reason that here, admitting for the moment that the house and fence was there when the railroad was built, *still the evidence is undisputed that the railroad company did invade the yard and dwelling, took possession of same, used it for an office for a while, and later used at as a shanty house for its employees for years, and afterwards picked up the house, and moved it over Thompson's creek, and that the railroad company took down the fence.*

Now, where the railroad company was authorized to acquire a right-of-way 100 feet wide on each side of the track, and actually took the possession of this house which stood there, we will have to look at the law relating to eminent domain in force at the time the railroad was constructed.

The Cheraw & Coal Fields Railroad Company was chartered in this State in 1857. According to the testimony of W. R. Godfrey (considered hereafter), the work of grading was commenced on this road about '62 or '63, but very little done. Captain J. D. Hardin testified that he came

here about 1874, and had charge of some grading in the construction of the Cheraw & Salisbury Railroad Company; that very little had been done by Cheraw & Coal Fields Railroad Company, and that what grading had been done had to be worked over. From the evidence in the case I am convinced that no actual construction of the road-bed was begun until 1874. This being the case, we must look to the Constitution of 1868 and the general Statutes in force at the time to see what the law was in regard to acquiring rights-of-way.

The time the charter was granted will not control, for in the case at bar, assuming there was no deed, no actual entry was made and construction begun until 1874, and the law of force when such entry was made will control. "The Port Royal Railroad Company was chartered in 1857, and its charter was renewed in 1870. The charter of 1857 prescribed the mode by which lands might be condemned to the use of the company, and by a general act, passed in 1868, a different mode of condemning lands to the use of the railroad corporations was prescribed. Held, that the company must proceed in the mode proscribed by the Act of 1868." *Verdier v. Port Royal R. R. Co.,* 15 S. C., 483.

Even if Cheraw & Coal Fields Railroad Company acquired no rights-of-way by deed, its successor, Cheraw & Salisbury Railroad, did not enter and take the right-of-way under the charter, and begin construction until 1874. Therefore the general law in reference to condemnation proceedings (the Act of 1868 and Act of 1872) will control. "Where the Legislature directs land to be taken for a highway or other public use, and provides a mode by which damages to the owner shall be estimated and compensation made, the party entering under the Act is not a wrongdoer, and the mode provided must be pursued." *Fuller v. Edings,* 11 Rich., 239.

Under the Act of 1868 (14 St. at Large, 89) it is clear that the Cheraw & Salisbury Railroad Company had the

right to take lands for its right of way. The evidence in the
case at bar is undisputed that the railroad company con-
structed its line or road along the land where the garage
building of Mrs. Rachel Baker, defendant, is now located,
about the year 1874. It is also undisputed that the railroad
company entered and took possession of the house situated
at this point; it first occupied the house using it as a rail-
road office; it removed the fence; it afterwards used the
house as a shanty house for its hands to live in; and it after-
wards moved the house away. The next question to be de-
termined is 'the legality of these acts of the railroad company,
and what was acquired.

In the case of *Sams v. Railroad Co.,* 15 S. C., 487, the
question under consideration being the remedy of the land-
owner where land was taken for railroad uses, it was said:

"No action of any kind, other than that allowed by the
Statute, can be maintained for damages. The statutory
remedy provided for securing compensations to those whose
lands are taken by the authority of the State supersedes and
excludes all other remedies. *McLauchlin v C. & S. C., R. R.
Co.,* 5 Rich., 597. *Fuller v. Edings,* 11 Rich., 245. In
the latter case the Court said: 'Where the Legislature au-
thorizes the laying out of a highway or the establishment of
other works deemed by them to be of public necessity and
convenience, or when in their opinion it is for the public
benefit, and in the construction thereof damages are sup-
posed to result to the property of others, and a mode is pro-
vided by Statute for the assessment and payment of the
same, the party so authorized is not a wrongdoer, and the
remedy for the person injured is confined to the *mode pro-
vided by the Statute,* and none exists at common law.    1
Am. Ry. Cases, 163; [*Stowell v. Flagg*] 11 Mass., 364;
[*Com. v. Bird*] 12 Mass. 446; [*Calking v. Baldwin*] 4
Wend. [N. Y.] 667, [21 Am. Dec., 168].' "

"Where a railroad company made entry upon land and
constructed its roadbed thereon by permission of the 'owner'

(which permission may be inferred from the facts and circumstances), such entry is not unlawful, and the railroad company is only liable thereafter for the value of the land so occupied and for any special damage caused by such occupation." *Tompkins v. Augusta & K. R. Co.,* 21 S. C.,. 420.

"The right to claim. compensation from the Wilmington and Manchester Railroad Company for land taken for the track of their road, *belongs to the owner of the tract at the time the road was finished through it, or his legal representative, and not to a vendee who purchased the tract from the owner after the road was finished through it."* (Italics mine.) *Lewis v. Wilmington & M. R. Co.,* 11 Rich. 91.

In the case of *Verdier v. Railroad Co.,* 15 S. C., 483, Mr. Justice McGowan, delivering the opinion of the Court (at page 481), among other things, says:

"The State, by the right of eminent domain, granted to the company the power to take any lands lying in their route, upon only one fundamental condition, viz., that the value of the land so taken should be paid to the owner, if required; for want of an agreement, or where parties would not negotiate, the value to be fixed by commissioners. In any event, however, with or without consent, the company was authorized to take as much as was necessary for a right-of-way. True, this could be done only in the manner prescribed by law, or with the assent, express or implied, of the owner and the plaintiff claims that the right-of-way was not condemned in the manner prescribed, and that the company are as much trespassers as if they never had a charter. If this were true, we suppose that the company would still have the right, under their charter, to retake the land and have it valued under the Act; so that, at last, even upon the view of the plaintiff, the only substantial right really involved is that of *compensation for the use of the| land;* and in such case it has been held, under circumstances somewhat analogous, that that right belongs only to the

owner of the land at the time of the construction of the road and cannot be pursued by a subsequent purchaser with notice, whose rights only commence at the date of his deed, and who takes the land in the condition in which he purchased it. * * * The Act of 1868 (Gen. Stat. 352; 14 Stat. 89), prescribes 'the manner of acquiring rights of way,' in cases of individual ownership. *McCrea v. Port Royal R. R. Co.,* 3 S. C., 381 [15 Am. Rep., 729]. One of the Sections of that Act provides that any person or corporation, before entering upon any lands for the purpose of construction, shall give to the owner thereof (if he be *sui juris*) notice in writing that the right of way over said lands is required for such purpose; which notice shall be given at least thirty days before entering upon said lands; and if such notice shall be given and the owner shall not, within the period of thirty days, signify * * * his refusal or consent * * * to entry upon his lands without previous compensation, the person or corporation requiring such right of way shall apply, by petition, for impaneling a jury to ascertain the amount which shall be paid as just compensation for the right of way, etc. And then Section 83 is as follows: 'Nothing herein contained shall be construed to prevent entry upon any lands for purposes of survey and location; *and if, in any case, the owner of any lands shall permit the person or corporation requiring a right of way over the same to enter upon the construction of the highway without previous compensation,* the said owner shall have the right, after the highway shall have been constructed, to demand compensation and to petition for an assessment of the same in the manner hereinbefore described; provided, such petition shall be filed within twelve months after the highway shall have been completed through his or her lands.'

"It is insisted that under these provisions there could be no 'permission' to enter upon the construction of the highway before the owner had received the notice required by a

previous Section; that such notice must be the first essential step to set up the easement, and, in fact, a condition precedent to securing any rights whatever under the Act by *permission, possession, consent or otherwise.* The requirement as to notice was made manifestly with a view to formal proceedings to assess the value in case of refusal, but surely it was never intended that the owner could not give the 'permission' without first receiving formal notice, without which the right to object remained in abeyance indefinitely. The notice was intended for the benefit of the company in cases of objection, to give them a starting point to condemn the lands but was unnecessary in cases of consent. *As the owner could give 'permission' without receiving previous notice, it might be inferred from facts and circumstances.* There was no express proof that the company gave the government 'notice in writing' that the right of way was required; but the company are supposed to have known of the act of Congress (*supra*), and there was proof that they, as early as 1870, entered publicly upon the lands, located and built their road, and continued in possession of it as part of their roadbed until 1876, when the land through which it ran was conveyed to plaintiff. During the whole of this time the authorities of the government acquiesced in such entry and use without objection, or claiming that they had no notice in writing, or asking the appointment of commissioners to assess the value.

"Whether, as matter of fact, this was enough 'to presume' that the notice was given, or that regular release of right of way was executed, it was at least evidence that the government 'permitted the corporation to enter upon the construction of the highway without previous compensation.' *The government, considered merely as an individual proprietor, had the right, with or without written notice, to require compensation. The manner of proceeding was open to the authorities of the government as well as to others, and upon the assumption that such right was not granted*

*or waived, it was their duty to speak and warn the company; but they stood by in silence for six years and allowed the company to incur expense in locating and building this road through these public lands. We think, as a matter of law, the government would now be estopped from denying this permission, this executed license, and from recovering the lands, and, as a consequence, the plaintiff, who holds the title of the government, is also estopped.* 'He who can forbid, and does not, is deemed to have assented. * * * If one having title to land looks on and suffers another to purchase and expend money on the land without making known his claim, he will not be permitted, afterwards, to assert his title against an innocent purchaser.' Herman's Law of Estoppel, § 409.

"In *Hand v. R. R. Co.,* 12 S. C., 351, this Court said: 'If a party having title to property, or a right in respect thereof, permits another to exercise authority over such property, or deal with such right, the latter shall not be subjected to damages by reason thereof, for *volenti non fit injuria.* This is a well-known legal principle, and, under its operation, a license to use both real and personal property is recognized as existing at law, both by deed and other writing under seal and by parol, and is also presumed from the conduct and relationship of the parties when not in terms expressed.' "

"The Act of 1868 prescribes the manner of securing compensation by private parties, for lands taken for right of way, and the government, while owner, having claimed it, the plaintiff, the donee of the government, cannot ignore that claim and recover the land itself. *No action of any kind, other than that allowed by the Statute, can be maintained for damages. The Statutory remedy provided for securing compensation to those whose lands are taken by the authority of the State, supersedes and excludes all other remedies.*" *Sams v. Railroad,* 15 S. C., 487. (Italics partly mine.)

Again: *"A grant for the purpose of the road will be presumed, in the absence of contract or valuation by commissioners, and unless application or assessment is made in ten years from completion of that part of road, then owner is forever barred from recovering compensation."*   (Italics mine.)   *Lewis v. Wilmington & M. R. Co.,* 11 Rich., 91. *Waring v. Cheraw & Darlington R. Co.,* 16 S. C., 416.

In *Tompkins v. Augusta & K. R. Co.,* 21 S. C., at page 430, Mr. Justice McIver, delivering the opinion of the Court, among other things says: "Under the construction given to Section 83 of Chapter LXIII, of the General Statutes of 1872 (which is the law applicable in this case), by the case of *Verdier v. Port Royal Railroad Co.,* 15 S. C., 476, where the landowner has permitted a railroad company to enter upon his land and construct its road, *he cannot maintain an action to dispossess said company, even though the steps prescribed by the Statute for the purpose of condemning so much of said land as may be necessary for the purposes of the company have not been taken.* The Statute, in compliance with the constitutional provision declaring that private property shall not be taken for the use of a corporation without the consent of the owner, or a just compensation being made therefor, provides that a corporation shall, before entering upon any land for the purpose of constructing its road, give notice to the owner, so that if he objects to such entry, the corporation shall first pursue the course prescribed by the Statute to have a condemnation of the land; *but if the owner does not object, but on the contrary, permits the company to enter, which permission, as is held by the case above cited, may be inferred from all the facts and circumstances, then such entry does not become unlawful, though it leaves the company still liable to pay for the value of the land taken, together with any special damage that the landowner may sustain by reason of such taking."*   (Italics mine.)

While it was the law that no dwelling house, yard, garden, or graveyard could be invaded without the permission of the owner, applying the principles of the cases above cited to the case at bar, we find that it is undisputed that Francis Lynch (from whom both plaintiff and defendant claim title) was the owner of the property, where Mrs. Baker is building the garage, at the time the Cheraw & Salisbury Railroad Company was constructed. The railroad company entered, and took possession of the house, broke down the fence, used the building for an office, and afterwards for a shanty house. Francis Lynch was *sui juris* in 1863, for defendant's chain of title shows that the Fairy Hill plantation was conveyed to him that year. Mr. W. R. Godfrey says that Francis Lynch made deed for a right of way between 1863 and 1865. He is presumed to have continued *sui juris* until a change is shown. Mr. Lynch was still alive in 1892, when to satisfy judgments his property was sold under execution, as shown by defendant's chain of title.

Therefore, I hold that the railroad company, entering and taking possession of the house for railroad purposes, would be deemed to have the permission of Francis Lynch, the then owner, for there is no evidence that Lynch ever objected, and he certainly knew when they entered and took his land. According to the cases above cited, if the railroad company went in and took Lynch's property for railroad purposes, Lynch had only one remedy, that being by petition to have a jury assess his damages, and he had two years after the taking of his property in which to file his petition for assessment of such damages.

The railroad company took this property about the year 1874, and Francis Lynch was the adjoining landowner until about 1892, a period of about 18 years, and, under authority of the cases above cited, as there is no evidence of any protest or any action by Lynch, it is presumed that he gave his permission for such taking, and he would be estopped to deny it. The remedy of the Statute was exclusive, and was

the only remedy he could pursue. And, according to the decisions, ten years after such taking a grant to the property is presumed.

I hold, therefore, that the railroad company acquired this right of way 100 feet wide from the center of the track at this point, by permission of Francis Lynch, the then adjoining landowner, and that this permission is implied from the facts and circumstances of the case, and from his silence in the face of such taking.

Another objection to the width of the right of way at this point, made by defendant, was that it was shown that in the construction of the road only 50 feet on each side of the track was cleared out when same was graded. This was testified to by Capt. Hardin at the reference of December 19th.

This witness states that, under the civil engineer in charge of construction, he was told to clear the right of way for 50 feet on each side of the track, which he did. He also states that this was in conformity with what Cheraw & Coal Fields had done prior to that time—cleared out 50 feet on each side. He also said that a part of the work on the Y (where Mrs. Baker's property is located) had been done, and he went over that, and reconstructed it. This witness admitted that all he knew about the right of way were his instructions as to grading; had never seen the charter nor any of the deeds to the railroad company. The defendant also sought to elicit from this witness a statement as to whether 50 feet from the center of the track on each side was sufficient for the purposes of the railroad company.

The Courts have held in this State that in such matters the railroad company alone are the judges as to what land is sufficient for its purposes. Where the charter authorizes a width of 200 feet, it is presumed that it took 200 feet, and the mere fact that they only cleared out 50 feet on each side in grading would not be sufficient to overcome that presumption. "And it has been held by the United States Supreme

Court that a grant by Congress of a right of way of a certain width is conclusive that the amount granted was necessary, and a showing of the amount actually used is immaterial." 22 R. C. L. pp. 849, par. 102.

Then, too, the testimony of W. C. Burr and W. G. Furlong, both railroad men of many years' experience, is to the effect that a railroad company seldom, if ever, clears out the full extent of its right of way. It would be too expensive and impracticable. Mr. Burr, who has been a section man for more than 30 years, says that only in a few places is the right of way cleared out to the full width; that in some places it is only cleared about 30 feet. I do not think that the testimony of Capt. Hardin can affect the width of this right of way acquired.

Another point raised by the defendant is in reference to the certified copy of the deed of Allan McFarlan to Cheraw & Coal Fields Railroad Company. This deed was in the judgment roll in cases of *Atlantic Coast Line Railroad Company v. D. Wallace Moore* and *Atlantic Coast Line Railroad v. E. G. Ingram,* which were proceedings to perpetuate the testimony of W. R. Godfrey. (The admissibility of these proceedings is considered hereafter in this report.)

The deed of Allan McFarlan conveyed property both in Chesterfield County, S. C., and in Anson County, North Carolina, Mr. Godfrey's testimony established the recording of the deed at Chesterfield, the subsequent destruction of the records in the courthouse there, and the destruction of the recorded deed. He also testified that all deeds to rights of way to Cheraw & Coal Fields Railroad Company were on printed forms, and all practically the same.

The certified copy of this deed provides that a right of way is granted sufficient for the purposes of the railroad company, not exceeding 200 feet in width, except at deep cuttings, etc. The defendant strongly urged the proposition that, under this deed, while the company had the right to

take as much as 200 feet, if necessary, for railroad purposes, they only acquired what they actually took.

This contention must be decided against the defendant, for the reason that this deed contains provisions almost identical with those in the deed considered by the Court in the case of *Harman v. Southern Ry. Co.,* 72 S. C., 228; 51 S. E., 689, and, construing that deed, the Court says at page 235 (51 S. E., 691) : "Our construction of the deed is that it was the intention of the grantor to convey such rights, to the full extent, as the railroad company would be presumed to have acquired, under the Statute, in the absence of a written contract, between the company and the owner of the land, through which the railroad was constructed. The plaintiff cannot be regarded as a purchaser for valuable consideration without notice of the railroad company's right of way, because he had actual notice that the railroad was being operated through said land, at the time of his purchase, and he had constructive notice, or is presumed to have known, that the company's right of way, in the absence of a written contract, extended one hundred feet on each side of the center of its track."

Applying this principle to the case at bar, the railroad company would be presumed to acquire, under such a deed as that of Allan McFarlan to Cheraw & Coal Fields Railroad Company, a right of way, to the full extent authorized by its charter.

Atlantic Coast Line Railroad Company, plaintiff here, relies on the presumption that it obtained the right of way under its charter, and that, even though an old house stood on the site (where the defendant, Mrs. Baker, is now erecting the garage building which is the subject of this action) at the time the railroad was built, the evidence is clear and undisputed that the company took the old house and used it as its own, and that the permission of the owner to such taking is presumed, under decisions before cited.

Plaintiff also offered the testimony of W. R. Godfrey as showing that Cheraw & Coal Fields Railroad Company actually got a deed to this property for a right of way, 200 feet on each side of the center of the track from Francis Lynch, but that the record of this deed was destroyed when the courthouse at Chesterfield was burned by Sherman's Army, and that the recorded deed was itself destroyed when the depot at Cheraw was destroyed by fire.

The testimony of W. R. Godfrey was taken in September, 1922, in *Atlantic Coast Line Railroad Company, Plaintiff, v. D. Wallace Moore,* and *Atlantic Coast Line R. R. Company v. E. G. Ingram,* being proceedings under what are now Sections 746, 747, and 748, Vol. 1, Code of 1922, to perpetuate the testimony of W. R. Godfrey in reference to lost deeds to the right of way of the railroad company.

The defendant was insistent that such testimony is inadmissible here, for the reason that neither she nor her grantors were made parties to those proceedings. The plaintiff insists that such testimony is admissible, because there was no known claim adverse to the railroad company, at the time the testimony was taken, in reference to the land on which the garage building is situated.

I will now consider this matter. Section 746 provides that any person interested in the preservation of the lost instrument, and desiring to preserve the evidence thereof, may bring the action, and makes provision as to what shall be alleged, and then provides: "And to said action all persons interested, or known or supposed to claim an interest in the property to which such testimony may relate, shall be made parties defendants, and served with summons as now provided by law in civil action."

Section 747 simply provides that the Judge at Chambers may grant all necessary orders.

Section 748 is as follows: "The evidence so taken shall be preserved, and the parties may have the same recorded in the office to which the same may relate; and such evidence

so taken, preserved and recorded, shall be received in all Courts, subject to the same rules as to competency and credibility as any other evidence."

These Sections must be construed together, and here we see that Section 746 provides for the taking of such testimony, and required that all persons interested, or known or supposed to claim an interest in the property, etc., shall be made parties and served with a summons.

Section 748 provides that such evidence shall be received in all Courts, etc., which shows an intention that such evidence may be used in actions arising after the taking thereof, provided the provisions of Section 746 are complied with.

Unquestionably, the evidence is admissible subsequently against all parties served with the summons in the proceeding. But the question presented here is, Is this testimony admissible against a person not served with a summons in the proceedings, who was not known to be interested, or whose claim was unknown to the party bringing such proceeding, at the time same was brought?

The testimony of Mr. Summey, plaintiff's witness, at the reference of December 15, 1924, was that he was connected with the real estate office of the plaintiff, and that his office had charge of getting rid of all encroachments in the vicinity of Cheraw; that in September, 1922 (time when Mr. Godfrey's testimony was taken), there was no building at all where Mrs. Baker's garage building is now being built, and that there was no claim known to the railroad company to any part of its right of way at that point. The testimony of Mr. Summey is not contradicted by any of defendant's witnesses. It is also undisputed that in 1922 there was no building on the present garage site, and that the right of way there was clear and free.

My construction of these Sections (746, 747, and 748) is that it was necessary to serve a summons on only claimants

or persons interested who were known or supposed to have an interest. Certainly the plaintiff could not serve a summons on a claimant of whom it had no knowledge and whose claim was not known. And Section 748 clearly shows a clear intention, where such testimony was taken, and a person had no claim at the time of such taking, but afterwards became a claimant, that the testimony would be admissible against such person. Therefore I am constrained to hold that, if Rachel Baker, or her grantors, were not known to claim, or supposed to claim any part of plaintiff's right of way at the point where the garage building is now located, at the time Mr. Godfrey's testimony was taken, such testimony is admissible in this action.

Mr. Godfrey testified that he first went with Cheraw & Coal Fields Railroad Company in 1862, as a clerk to the president, Allan McFarlan; that he was also appointed right of way agent, and secured the deeds to rights of way from Cheraw to the North Carolina State line, securing deeds from every landowner, with the exception of one near the North Carolina State line; that he secured these deeds, and same were recorded at Chesterfield, and that the records were destroyed when the courthouse was burned in 1865; that these recorded right of way deeds were kept in the treasurer's office in Cheraw; that the deeds were bound in a large book, and were kept on top of the safe—as the book was too large to go inside; the office was burned and the deeds destroyed; that Francis Lynch and William Godfrey gave deeds for the north leg of the wye, Francis Lynch giving the part where the garage building is located, which was the main line of the Cheraw & Salisbury Railroad Company; that the right of way was 100 feet wide from the center of the track on each side; that he had been connected with Cheraw & Coal Fields Railroad Company, Cheraw & Salisbury Railroad Company, Cheraw & Darlington Railroad Company, Atlantic Coast Line Railrod Company of South Carolina, and Atlantic Coast Line Railroad

Company, for 50 years, and all of that time at Cheraw, except 4 years at Society Hill, when he first got married; that during the 50 years that he was connected with the railroad company there were no disputes or claims as to the right of way by any persons around Cheraw; that the main line of Cheraw & Salisbury Railroad Company was at the north leg of the wye below the passenger station at Cheraw.

It appears from the testimony of H. L. Powe, undisputed that W. R. Godfrey was agent of Atlantic Coast Line Railroad Company at Cheraw until 1910, or 1911, and that H. L. Powe has been agent since that time.

Another matter raised by defendant was that the charter authorized Cheraw & Coal Fields or Cheraw & Salisbury Railroad Company to be constructed from Cheraw to the North Carolina line, and that the word "from" was exclusive, and would not give the railroad company the right to enter the incorporate limits of the town of Cheraw. The plaintiff, however, put in evidence an old plat of Cheraw, made by H. L. Loughlin. Exhibit A. This plat is undated, but the testimony of William Godfrey, the only testimony in regard to same, is that the plat was in general use in Cheraw as far back as June, 1900. Mr. Godfrey also testified that he was 54 years of age; that when he was a boy the southern boundary of the town ran along a line about 300 feet south of Church street; that there is a line of old trees, one on Second street in front of the sash mill office, and another in St. David's cemetery, the line running through the cemetery. From plats in evidence, I can take notice of the fact that this line, the old southern boundary of the town of Cheraw, is about 500 yards north of the property of Mrs. Baker.

Mr. Godfrey also testified that the Atlantic Coast Line passenger station, and the property below there, was not within the town limits when he was a boy. Defendant offered no evidence on this point.

Plaintiff called the Court's attention to various Acts of the South Carolina Legislature prior to 1900, amending the charter of the town and extending the limits, etc., to show that Mrs. Baker's property was not in the town limits when Cheraw & Salisbury Railroad was built. Plaintiff also offered in evidence Exhibit 1B, minutes of the town council of the town of Cheraw for the year 1900, to show that the property at the point where the garage is located was not taken into the town of Cheraw until that time. I think it is clear that the land where this garage building is being built was not in the town of Cheraw at the time the railroad was built, but was outside of the corporate limits of the town of Cheraw.

Having found that plaintiff, Atlantic Coast Line Railroad Company, is the legal owner of a right of way for railroad purposes on what is now called the north leg of the wye, where Mrs. Baker is building the garage building, 100 feet wide, from the center of the track on each side, measured radially from the center of the track, the next question to be presented is, Has the defendant acquired title to a part of this right of way by adverse possession?

Under the form of action such as plaintiff has brought here, it would not be necessary for plaintiff to prove a legal title, but it need prove only possession in order to recover. And the defendant cannot recover on the weakness of plaintiff's title or the failure of plaintiff to prove a title, but must prove title in herself or permission to use the property from a person proved to be the real owner. *Cathcart v. Matthews*, 91 S. C., 468, 469; 74 S. E., 985; Am. Cas. 1914A, 36. *Beaufort Land & Investment Co. v. New River Lumber Co.*, 86 S. C., 358; 68 S. E., 637; 30 L. R. A. (N. S.), 243.

However, the plaintiff went ahead and proved its title. Section 320, Vol. 1, Code 1922 (Code of Civil Procedure), provides: "In every action for the recovery of real property, or the possession thereof, *the person establishing a legal title to the premises shall be presumed to have been possessed*

*thereof within the time required by law; and the occupa-*
*tion of such premises by any other person shall be deemed*
*to have been under and in subordination to the legal title*
unless it appear that such premises have been held and pos-
sessed adversely to such legal title for ten years before the
commencement of such action."    (Italics mine.)

I have italicized portions of the above Section of the
Code, as special attention will be called to same later in this
report.

Section 320 of the Code of Civil Procedure, above cited
has been construed several times to mean that, where a
person proves legal title to real property, the person so
proving the legal title is presumed to have been in posses-
sion of the premises for 10 years. *Love v. Turner,* 71 S. C.,
*322;* 51 S. E., 101. *Dickson v. Epps,* 104 S. C., 387; 89
S. E., 354.

So here, Atlantic Coast Line Railroad Company having
proved a legal title to the premises, it is presumed to have
been in possession thereof for 10 years; and any use of the
premises by any other person is presumed to have been
in subordination to the legal title, unless it appears that such
premises have been held and possessed adversely to such
legal title for 10 years before the commencement of such
action.

Before going into the question of adverse possession, I
wish to call attention to the answer of defendant.    The
answer alleges that "the defendant, her predecessors in
interest and grantors, have been, for more than 10 years
prior to the commencement of this action, in the open,
notorious, adverse, and exclusive possession of the land
upon which said trespass is alleged," etc., and denies that
plaintiff has ever been seized or possessed of same.

There are also similar allegations of possession for 20
years and for 40 years, but nowhere in the answer is it al-
leged that defendant was in possession under claim of right
or claiming under a written instrument.

.  The Code of Civil Procedure (Volume 1, Code of 1922), by Sections 321 and 324, provides for occupation under written instrument, and for adverse possession under claim of title not written.   .

Section 321, provides: "Whenever it shall appear that the occupant, or those under whom he claims, entered into the possession * * * *under claim of title,* exclusive of any other right, founding such claim upon a written instrument," etc.   (Italics mine.)

And Section 324 provides: Where it shall appear that there has been an actual continued occupation of premises, *under claim of title,* exclusive of any other right but "not founded upon a written instrument," etc.

I merely cite these provisions of the Code to show that in either event, adverse possession under a written instrument, or adverse possession not founded upon a written instrument, there must be a claim of title, and nowhere in this answer is it alleged that she claimed the land as her own.

In their arguments the attorneys for defendant did not indicate whether they claimed under color of title, that is, their deeds, or whether they occupied the premises. under a claim of right.  As this is an equity case, and the strict rules of pleading are not enforced, I shall consider both possession under claim of title founded upon a written instrument, and also possession under claim of title not founded upon a written instrument, although neither are set up in the answer.

The plaintiff claims that it got its right of way at this point from Francis Lynch in 1863 or 1864, but, anyway, it constructed its road, and took possession of the right of way at this point in 1874.

Francis Lynch remained the owner of the adjoining land until 1892.  Defendant put in evidence the case on appeal in *Atlantic Coast Line Railroad Company v. Rachel Baker,* Exhibit ————, showing her chain of title beginning on

page 25. Reference to this Case at page 26 shows abstract of deed of D. B. Douglass, Sheriff, to A. G. Kollock, dated April 14, 1892; it being stated that this land was sold under execution against Francis Lynch.

A. G. Kollock owned the premises until he conveyed to W. G. Howard on September 6, 1901; abstract of this deed being set out in Case on page 26. It will be noted that this deed conveys the lot now owned by Mrs. Baker, though the lot was much larger then than now.

The description in this deed is important, and I set same out, as follows: "All that piece, parcel or tract of land in Chesterfield County, State aforesaid, lying between the Chesterfield & Society Hill public road and the passenger depot of the Cheraw & Darlington Railroad and the Y of the Cheraw & Salisbury Railroad, being bounded north by Cheraw & Darlington passenger depot property; east by Cheraw & Darlington Railroad; south by the Y of the Cheraw & Salisbury R. R. and west by the public road from Cheraw & Society Hill, being a long narrow strip of land. *When this deed calls for railroad it only conveys to the right of way, however, as I do not intend to convey the railroad right of way hereby.*" (Italics mine.)

It is clear the defendant cannot claim any part of the railroad right of way under this deed, for it expressly states that it was not intended to convey any part of the right of way.

The next deed in defendant's chain of title is the deed from W. G. Howard to J. H. W. Stevens and J. H. Stevens, dated October 7, 1902. This deed conveys: "All that piece, parcel or lot of land, in the above State and County, bounded on the north by Cheraw & Darlington depot; east by the right of way of Cheraw & Darlington R. R.; south by said Cheraw & Darlington Railroad Y right of way and west by lands already conveyed to said lumber company by me heretofore, being the strip of land lying between Cheraw

& Darlington Railroad and the Society Hill road, conveyed to me by A. G. Kollock in 1901."

"Color of title" is anything which shows the extent of the occupant's claim. *Sprott v. Sprott,* 110 S. C., 438; 96 S. E., 617.

Section 321, Vol. 1, Code 1922, providing for occupation under a written instrument, provides: "And * * * there has been a continued occupation and possession of the premises *included in such instrument,* decree, or judgment, or of some part of such premises under such claim for ten years, *the premises so included shall be deemed to have been held adversely,"* etc.　(Italics mine.)

. I merely cite the above to show that a person claiming under a written instrument, or "color of title," has adverse possession only of the property *included within the written instrument* or "color of title."　And his possession under a written instrument cannot extend beyond the limits prescribed in such instrument.　This has been so often decided as to need no citation of authorities.

In the case of *Connor v. Johnson,* 59 S. C., 115; 37 S. E., 240; Mr. Chief Justice McIver quotes with approval the charge of the Circuit Judge (Judge Watts) as follows: "If Connor's deed calls for Johnson's land as its northern boundary, and gives courses and distances also, his color of title extends no further than Johnson's line, for adjacent boundaries control courses and distances, and when a tract calls for another as a boundary, its lines cannot go beyond the lines of the older grant."

Applying these principles to the deed of W. G. Howard to J. H. W. Stevens and J. H. Stevens, where this deed calls for the railroad right of way, it was intended to exclude the right of way, and the boundaries would extend only to the right of way.　Hence it is clear that the defendant cannot claim adversely under this deed.

Both J. H. W. Stevens and J. H. Stevens died sometime subsequently, as shown by the Case, p. 27, and this lot was devised to Mrs. J. Anna Stevens.

The next deed of record in defendant's chain of title is the deed from J. Anna Stevens to W. L. Gillespie and R. D. Hughey, dated March 3, 1913. Abstract of this deed is set out in Case, pp. 27, 28. It is clear that the defendant cannot claim adversely under this deed, as the deed itself gives the right of way as a boundary.

Subsequently, R. D. Hughey conveyed his half interest to W. L. Gillespie, the date of which is not given. See Case, p. 28.

The next deed in defendant's chain of title is that of W. L. Gillespie to John D. Murphy dated December 31, 1919. See Case, p. 28. The next deed is that of John D. Murphy to J. F. Harper and L. C. Wannamaker, dated January 5, 1924, set out in Case, p. 29.

Then J. F. Harper and L. C. Wannamaker conveyed to Mrs. Rachel Baker, by deed dated August 19, 1924, abstract of same being set out in Case, p. 29. The description of the property conveyed in this deed is as follows: "Beginning at the corner of the lot formerly owned by Nora Gregg on the east side of Cheraw & Society Hill public road and running back to right angles to said road to the Atlantic Coast Line Railroad property; thence along the line of the said railroad property in a southwesterly direction to a point near where the north leg of the Y crosses the old Cheraw & Society Hill public road; thence with public road," etc. It is clear that Mrs. Baker cannot claim adversely under this deed, for the reason that the railroad property is excluded therefrom. And it is clear that the defendant cannot claim title to plaintiff's right of way by adverse possession, basing such claim upon a written instrument, as her deeds do not cover the right of way.

The defendant offered in evidence plat of the town of Cheraw made by Gillespie & Watson, civil engineers. Ex-

hibit 2. The plaintiff objected to the introduction of this
plat on the ground that same was made for the town coun-
cil of Cheraw, and that the Atlantic Coast Line Railroad
had nothing to do with same, no knowledge of the map,
and was not consulted about it, and therefore could not be
bound by it.

Major W. L. Gillespie, one of those who made the map,
testified that it was made for the town council of Cheraw,
and that in making the railroad company was not consulted
about it, nor did the company have anything to do with the
making of said plat.

I admitted the plat for what it would show, but I do not
think that same would bind plaintiff. If Major Gillespie, in
making the plat for the town council of Cheraw, without
consulting plaintiff railroad company, went ahead and put
in the right of way of what was Cheraw & Salisbury Rail-
road Company as being only 50 feet wide from the center
of the track on each side, when as a matter of fact the
right of way was 100 feet wide from the center of the
track on each side, such plat could not in any way bind the
plaintiff.

However, I am going to consider this plat as showing
what Major Gillespie (one of the defendant's grantors)
claimed in reference to the lot where the garage is located.
Granting that this plat would be "color of title," and that
Gillespie claimed under it, would not avail the defendant
here, for the reason that the plat states that the property
was surveyed in 1914, and no one person has held the
property 10 years since then. Gillespie conveyed to Murphy
in 1919; Murphy conveyed to Harper and Wannamaker in
1924; and Harper and Wannamaker conveyed to Rachel
Baker in 1924.

There can be no 10 years' possession under a written
instrument or "color of title" as the 10 years' possession
must be in one person, except in the case of ancestor and
heir, and in such case the heir may tack his possession to

that of the ancestor. Here possession under color of title could not commence prior to the Gillespie plat in 1914; the question of ancestor and heir does not arise; and there has been no possession by any one person for 10 years.

Then, too, as there was no color of title prior to 1914, there can be no 20 years' possession nor any 40 years' possession, as only 10 years have expired since then.

From this evidence, and under the decisions of this State, I find that the defendant has established no adverse possession based on a claim of title under a written instrument, or "color of title."

Before going into the consideration of whether defendant has shown adverse possession under claim of title not based upon a written instrument, there are one or two observations to be made here.

As I have already stated, the plaintiff having proved legal title to the right of way, which would include the land where the garage building is situate, the plaintiff is presumed to have been in possession of same for 10 years, and any use of the premises by the defendant or her grantors is presumed to have been in subordination to the legal title, unless defendant shows adverse possession. And the defendant, setting up adverse possession, must assume the burden of proving same.

Inasmuch as title to a railroad right of way cannot be acquired by "adverse possession," as we ordinarily use the term in reference to land generally, I will stop here for a moment and consider the respective rights of the owner of the right of way and the adjoining landowner. These are clearly stated in the syllabus of the case of *Atlanta & Charlotte Air Line Ry. Co. v. Limestone Globe Land Co.,* 109 S. C., 444; 96 S. E., 188, as follows:

(1) "The owner of the fee in a railroad right of way has the right to use so much thereof as is not in the actual use and occupancy of the railroad company, provided the

use be not inconsistent with the claim of right of way for the railroad purposes."

(2) "A right of way of a railroad, having been acquired for a public purpose, cannot be lost by prescriptive use or adverse possession, unless by the erection of a permanent structure, accompanied by notice to the railroad company of an intention to claim adversely to its right."    '  .

(3) "That owners of fee of railroad right of way, after the railroad was built, continued to use the right of way up to the railroad as they always had done, cultivating it and enclosing it for pasture, etc., did not amount to adverse possession against the railroad company."

"This mere use or cultivation of land included within the right of way of a railroad company or enclosing the same under fence without notice to carrier of adverse use is not such adverse use as will give currency to the Statute of Limitations against the railroad company." *Atlantic Coast Line R. R. Co. v. Epperson,* 85 S. C., 134; 67 S. E., 235.

The same general rule is laid down in *Harman v. Southern Ry.,* 72 S. C., 228; 51 S. E., 689.

The plaintiff put in evidence plat of its right of way (Exhibit Plat H), and from it a general idea of the situation can be obtained. Plaintiff also put in evidence another plat, showing the alleged encroachment on a larger scale. Exhibit Plat B.

The defendant has a dwelling house which is partly on the right of way, as is admitted by both sides, but under the authority of *Columbia N. & L. R. R. Co. v. Laurens Cotton Mills,* 82 S. C., 24; 61 S. E., 1089; 62 S. E., 1119, the only encroachment which the Court can consider is the one which is the subject of the action. And in *Southern Ry.-Carolina Division v. Howell,* 79 S. C., 281; 60 S. E., 677, it was held that evidence of other encroachments is not admissible.

The action is brought only to restrain the erection of the

garage building, and I am confined to the consideration of that encroachment alone.

It is too clear to require citations of authorities to support the proposition that, where a railroad company owns a right of way, and merely uses the roadbed, still its possession extends to every part of the right of way, except where same may be encroached upon by permanent improvements, such as buildings, etc.

We have already seen that the adjoining landowner can use the right of way in any manner he chooses, so long as the use is not inconsistent with the railroad company's use of same for railroad purposes. Keeping these rules in mind, we will now see if the defendant has proven any adverse possession under claim of title not based on a written instrument.

The only evidence offered by defendant of adverse possession was the testimony of W. L. Gillespie, Wash Wingate, and W. R. Hancock.

The testimony of W. L. Gillespie, at the reference of December 19th, was, substantially: That he and R. D. Hughey bought the lot now owned by Mrs. Baker from Mrs. Stevens, and that he subsequently bought Hughey out. That there was an old house on the property when he bought it, and the house stood about where Baker's garage now stands. The house was burned, and he collected insurance. It was an old double house; had been used by Stevens Lumber Company; house as he recalled it, a two-room house, and ran pretty near right of way; was not within 50 feet of the track. That he owned the building a year or two before it burned. House was burned about 1914. Lot was not inclosed after house burned; had no dealings with railroad company in regard to the house. Garage is on what he considered his property. If railroad claimed all that land, he would not have any property at all; never said anything to the railroad about the house (reference of December 26th). About 2 years ago, Burr, section master, staked

off right of way 65 feet from the center of the track. The old double house stood on the northeast portion of the land now occupied by the garage. The other portion of the lot, other than that on which the house stood, was used as a garden and yard year after year, up to and on the 65-foot right of way. The house was occupied by the owners and the tenants "up until I purchased this lot," and, after the old house burned in 1913, there was no other house built on the lot until the garage building now being erected was built. It might have been 1914 when old house was burned.

The only testimony of the witness, W. R. Hancock, on question of adverse possession, was substantially as follows (reference December 22d). "I remember the old building. It was located about 8 feet nearer the track than Mrs. Baker's garage building. Stevens owned it. Some darkies were burned in the house; house burned during Capt. Stevens' lifetime. House was there as far back as 1894."

Wash Wingate's testimony, along this line, was in substance (reference December 19th, pp. 9 and 10) : That he did not know who was living in the house when it was burned; did not know whether the house was there in 1901 or not; did not know whether it burned 15 years ago or 5 years ago (reference December 31st, p. 5) ; that he thought house was there when railroad was built, but would not be certain but it was an old house then; did not remember any section hands living in the old house.

Now, to give the defendant the benefit of every doubt, I am going to consider all the evidence she has offered of adverse possession, and see what it amounts to. Major Gillespie says that he is positive that there was an old house on the property when he bought it which stood on the northeast corner of the land now occupied by the garage; that Mrs. Stevens had rented the old house out, and collected rent, and that he also had tenants in it; and that, about a year after he acquired it, the house was burned, and he col-

lected the insurance. He also admits that he never said any-
thing to the railroad company about the house. Wash Win-
gate says the old house stood between the present garage
and the railroad track, and some children were burned up
in the house. Hancock says practically the same thing, al-
though he says that the house was burned during Capt. J. H.
W. Stevens' lifetime; that Stevens kept tenants in the
property.

The Supreme Court, in *Stokes v. Murray,* 95 S. C., 120;
78 S. E., 741, quotes with approval the language of Chief
Justice McIver in *Thomas v. Dempsey,* 53 S. C., 218; 31
S. E., 232, as follows: "The rule is well settled that where
the question is whether a party has acquired title to real
estate by adverse possession for a period of ten years, [it]
must be *clearly proved and shown."* (Italics mine.)

On the question of what is sufficient as proof of adverse
possession, I again quote from the opinion of Mr. Chief
Justice McIver, in *Thomas v. Dempsey,* as follows: "It
seems to us that this testimony is not only insufficient to
show that either Baum or Baum & Co. had such adverse
possession for a period of ten years as would give him title,
but does not even tend to show that fact. Even assuming
that Baum's possession commenced when the plaintiff and
her sisters commenced to pay rent under the apprehension
of being ejected, *the testimony leaves it altogether uncertain
when that occurred;* one of the witnesses saying that it was
some time in the year after the death of R. D. Thomas,
which was the year of 1886, and the other witness saying
that she thought that they began to pay rent in June or July,
1887. If it was in July then the ten years had not expired
when this action was commenced. *Besides, there was no
testimony whatever, even tending to show that Baum's pos-
session (if indeed, he can be said to have had any) was
either continuous or adverse for the whole period of ten
years, which would be necessary to give him title.* On the
contrary, the testimony tends not only to show that the lot

was vacant for a while after the plaintiff and her sisters left it, some two or three years after the death of R. D. Thomas, in 1886, but also that the defendant, Boykin, was in possession of it, and had been for about eighteen months, as the tenant of the defendant, Paul Dempsey, and there is nothing in the testimony to connect Dempsey with Baum." (Italics partly mine.)

Leaving out of consideration for the moment any evidence of plaintiff on the question of adverse possession, and treating this case as though plaintiff had offered no evidence on this question, I cannot escape the conclusion, even considering defendant's evidence in every way most favorable to her, that there is no proof of adverse possession, such as would give title, in any person for 10 years.

Granting that Mr. Gillespie is correct in saying that the old house which was burned stood partly on the site where the present garage building is being built, none of defendant's witnesses know who put the old house there, nor when it was put there. They say it was used by Stevens, but there is no testimony as to how Stevens used it, nor when. Gillespie says that Mrs. Stevens collected rent from the persons occupying the old house, but there is absolutely no evidence as to how long she collected rent, nor when. Mrs. Stevens conveyed to Gillespie in 1913, and the house was burned the following year, 1914, and, according to Gillespie, there was no inclosure around the site where the old house stood, and no other building was put on the site, until Mrs. Baker started on the construction of this garage in August, 1924. This being so, it is clear that no 10 years' adverse possession, under claim of title not based on a written instrument, has been proved. If Gillespie was in adverse possession, that possession ceased when the building burned in 1914, and the site which it occupied left vacant. It is clear that, if it burned before August, 1914, the plaintiff has been in possession for railroad purposes for the last 10 years.

Adverse possession, such as will give title, must be hostile to the true owner, open, notorious, and continuous, and there are several elements lacking in the case at bar. There is nothing in the evidence anywhere to show that Mrs. Stevens' possession (if she had any) was hostile to plaintiff, and, the plaintiff having proved legal title, the possession of Mrs. Stevens is presumed to have been in subordination to the legal title.

"In addition to the necessity of having an open, notorious, exclusive and hostile possession, as stated heretofore, it is also essential that such possession, should be shown to be continuous and uninterrupted for the full statutory period. The moment the possession is broken it ceases to be effectual and as often as the break occurs, the law restores the constructive possession of the owner." 1 R. C. L. pp. 716, 717, § 30.

" 'It has been said that, if there be one element more distinctly material than another in conferring title by adverse possession, where all requisites are so, it is the existence of a *continuous* adverse possession. *There must be such continutiy of possession as will furnish a cause of action for every day during the whole period required to perfect title by adverse possession.'* 2 Corpus Juris, 82. *Porter v. Kennedy,* 1 McMul., 354; 26 S. C. L. *Hill v. Saunders,* 40 S. C. L. (6 Rich.), 62. *Massey v. Duren,* 3 S. C., 34." *Cathcart v. Matthews,* 105 S. C., at p. 340; 89 S. E., 1025. (Italics mine.)

We have already seen that the only adverse possession as against a railroad right of way is of a use inconsistent with the railroad's use for railroad purposes, such as a permanent building. In the case at bar, there is absolutely no showing of any adverse possession in Mrs. Stevens for the requisite period. The house burned down in 1914, the year after Gillespie bought it, and admittedly there has been no structure of any kind on the right of way at this point since 1914, nor has there been any inclosure of this part of the

17—S. C. R.

right of way by a fence. Gillespie himself says that there has been no house there, so it follows, therefore, that there has been no adverse possession since 1914. As soon as defendant started building there in August, 1924, plaintiff notified her to stop, and upon her refusal to do so, started this action.

"With that exception, the only possession which either party, or his predecessors, has had of the land in dispute, has been that constructive possession which extends to the limit of their respective color of title; and there can be no constructive adverse possession of land against the owner, where there has been no actual possession which he could treat as a trespass and bring an action for. *Turnipseed v. Busby,* 1 McCord, 280. *Steedman v. Hilliard,* 3 Rich. Eq., 101. *Love v. Turner,* 71 S. C., 322; 51 S. E., 101. There is not a particle of evidence that defendants, or their predecessors, ever committed any trespass on the land in dispute for which an action could have been brought prior to the trespass for which this action was brought." *Clary v. Bonnett,* 114 S. C., 459; 103 S. E., 781.

It is thus seen that the possession to be adverse must amount to trespass, such as would give the owner a right of action therefor. And we have already seen that the owner of the adjoining land may use the right of way in any manner he sees fit, so long as he does not put it to a use inconsistent with the railroad's use for railroad purposes. So, where there was no building on the lot, as was the case here, Mrs. Baker and her predecessors had the right to use it for a garden or any other such purpose. But nowhere in the evidence is it shown that there has been any trespass on this part of the right of way since 1914 that would have given the Atlantic Coast Line Railroad Company a right to start action for. This being so, it is clear that there has been no adverse possession since that time. The moment the defendant did trespass and started the garage building, the plaintiff began its action.

Then, too, Major Gillespie's testimony would lead one to believe that his claim was based upon a misconception as to where the line of the right of way ran. In other words, he said he had always understood that the right of way at this point was only 59 feet from the center of the track on each side.

In the case of *Ouzts v. McKnight,* 114 S. C., 303; 103 S. E., 561, Mr. Justice Gage, delivering the opinion of the Court, at page 305 (103 S. E., 562), among other things, says:

"The testimony was taken by the Master, and from it the Circuit Court concluded that the plat indicated the true line betwixt the parties, and that the plat was part of he deed; that the defendant sumpposed that the line run on the ground was that run on the plat, and he thought the plaintiff was in actual possession of an equal quantity of land with himself; but that nevertheless the defendant went upon the land in issue, and has held it adversely for ten years, and the plaintiff is now barred to claim it. The plat showed the line A, B, was the true dividing line. The Court found the facts correctly, but not the law. There was no room to apply the Statute of Limitations.

"The defendant in effect admits that there was a mistake in running the line on the ground, for he testified that he only knew that a mistake had been made in running the line on the ground a year before the action was brought, and that *up to that time he had been under the impression that there had been a fair and equal division of five hundred acres to the side. That amounts to saying that he was on the plaintiff's land, but did not know it, and did not intend to be there.*

"Adverse possession is hostile possession, and hostile possession is possession with intention to dispossess the owner. 3 Washburn (4th Ed.), p. 129."

So, in the case at bar, Major Gillespie says that he always thought and claimed that the right of way was only 50 feet

at this point. Then, in going upon the 100-foot right of way, he was on plaintiff's land, and did not know it. He thought that plaintiff had all the land it was entitled to when it came out 50 feet. Major Gillespie, therefore, if he trespassed on the 100-foot right of way, did so because of a mistaken idea that it was his land. He did not know that it belonged to Atlantic Coast Line Railroad Company. Therefore, his possession was not with intent to dispossess the railroad company, for he thought it had all it was entitled to. Therefore, the possession of Major Gillespie, if he had same, was not hostile, and nowhere in the case is there any evidence that plaintiff had any notice of any claim.

Then, too, the testimony of B. B. Baker, husband of the defendant, and who testified in her behalf, leads to the conclusion that he placed the garage building more than 65 feet from the center of the track, because he thought the right of way here was 65 feet on each side of the track.

Even if plaintiff had offered no evidence on the question of adverse possession, I could not escape a finding that the defendant has failed to prove any adverse possession as would give her title to plaintiff's right of way at the point where the garage building is now being erected.

And, as stated above, I have gone ahead and considered the question of adverse possession, both under claim of title founded on a written instrument and claim of title not founded on a written instrument, though I am convinced that adverse possession is not properly pleaded in the defendant's answer. I am of the opinion that, in addition to allegations of possession, there must be allegations of claim of title, coupled with such possession.

On the question of adverse possession the plaintiff swore H. L. Power, its agent at Cheraw, who testified substantially that there had been no house on the site of the present garage building since he had been connected with the roads, that is, since 1907, and he has been with the road since 1911; that there has never been a house on the present garage site

to his knowledge. Both Power and Burr say that the house the negro children were burned in while Gillespie was the owner was not on garage site at all, but was between Mrs. Baker's residence and passenger depot.

Granting that these witnesses might be interested, on account of the fact that they are employees, we will next consider the testimony of others. Mr. J. R. Harrell, hardware dealer of Cheraw, a disinterested witness, says that he came to Cheraw in December, 1887, when old Cheraw Machine Shop was started. This was located just across the public road from where Mrs. Baker is now erecting the garage; that when he first came to Cheraw there was an old double house which stood about where Mrs. Baker's garage is; that the building was an old one when he first saw it, and it was a railroad shanty house, as the section hands lived in it; that it was the only house between the Atlantic Coast Line passenger station and the point where the north leg of the wye crosses the Cheraw & Society Hill public road, and, as long as he knew it, there was no other house there; that Cheraw Machine Shop was burned out in 1895, and he left that vicinity, and does not know what transpired afterwards. House was still there when he left. Mr. Harrell also said that, when Stevens owned the property which Mrs. Baker now owns, he (Stevens) bought the old pattern house which belonged to Cheraw Machine Shop, and moved same across the public road.

Mr. W. J. Brown, another witness not connected with the road, testified that in 1912 or 1913 he was interested in a Mr. Hereford who had tuberculosis, and used to go to see him daily; that Hereford lived, until he died, in a small house between Mrs. Baker's residence and Atlantic Coast Line passenger station; that at that time there was only one other house between Hereford's house and where the public road crosses the north leg of the wye, and that house was the house in which the children were burned, and stood between where Mrs. Baker's residence now stands and the

passenger station; that he had been down there and located that old house in which the children were burned by an old mulberry stump which stood in the back yard, and that the stump is still there.

Beverly Bass testified about the old house and its being the only house down there, and its being used as a railroad office at first, and afterwards as a section house, and that it was the only house down there. This is corroborated by Mr. J. R. Harrell, who says the house was there from 1887 until 1895; that it was an old house, and used by section hands. Beverly Bass also said that in later years the old shanty house was picked up by the railroad company and carried over Thompson's creek. This must have been after 1895, and before 1896, as Mr. Burr says the shanty house was not there in 1896.

Neither Major Gillespie, nor Mr. Hancock, nor Wash Wingate, defendant's witnesses, knew who built the old house the children were burned in, or when same was placed on the land. It is very probable that this was the pattern house, bought by Mr. Stevens, and moved over on that lot, as testified to by Mr. Harrell. If so, there is nothing to show when this was done, nor the circumstances under which it was done.

The testimony is that the house was an old house, and the roof had about fallen in. It might have been there by permission of the railroad company, for it had the legal title to the 100 feet right of way, and under the law the use of the right of way by any other person is presumed to have been in subordination to the legal title.

There is no showing of adverse possession, and the plaintiff is clearly entitled to its right of way. The defendant is insolvent; her acts in erecting this garage building amount in law to a continuing trespass, for which the legal remedy is inadequate.

While there are allegations of laches and non-user of the right of way in the answer, there was absolutely no evidence

to support the allegations, and I find that there is no bar of laches, nor any non-user.

I would recommend, therefore, that the prayer of the complaint be granted, and that the defendant, Rachel Baker, her servants, agents or employees, and all persons acting for her or her behalf, be permanently enjoined and restrained from prosecuting the erection of this garage building, which is the subject of this action, and that the said Rachel Baker have 30 days from the date of this order in which to remove the said structure from the right of way of plaintiff; that plaintiff have judgment for the costs and disbursements of this action.

The Master submitted the following supplemental report:

The attorneys for defendant have raised some question as to what transpired at the references held in the above-entitled cause, and which was omitted from the record, and I submit this supplemental report in order to inform the Court as to this.

At the reference held in Chesterfield, on the 22d of December, counsel for plaintiff admitted on the record that the garage building of the defendant, or the land on which said garage stands, is within the corporate limits of the town of Cheraw, and that same was within the town limits in 1860.

At the next reference, held in Cheraw on the 26th day of December, 1924, the stenographer was absent, and I took the testimony in long hand. Counsel for plaintiff stated that their admission on the record that Mrs. Baker's property was within the corporate limits as far back as 1860 was made under a misapprehension as to the true facts, and asked permission to withdraw such admission. I granted this permission, and permitted them to introduce evidence as to the corporate limits of the town of Cheraw at that and subsequent references.

Inasmuch as I permitted the admission to be withdrawn, and allowed testimony on the question, I did not consider that it was necessary to set same out in record.

I have carefully examined the record, and the above, so far as I have been able to ascertain, are the only omission for same.

The decree of Judge Dennis is as follows:

The action was brought by the plaintiff to restrain the defendant from trespass on its right of way; the said trespass being the erection of a building on lands claimed to be the right of way of the plaintiff. This is one of the most voluminous cases that I have had to consider, and I have spent a great deal of time going over the evidence and the law. I have reached certain conclusions which will be stated in this decree in such a way as to avoid taking up the report of the Master and the exceptions thereto in detail, as I do not consider such course necessary.

I conclude that the ninth exception of the defendant should be sustained, in that I do not think the testimony admissible as against this defendant.

I find that the Statutes of North Carolina were properly admitted in evidence, and show that a right of way of 100 feet from the center of each side was the right of way of the Cheraw & Salisbury Railroad.

I find that there is not sufficient testimony to show adverse possession in either party to this action. It seems to me clear that the vital question in this case has become confused; that is to say, from what point did the right of way of the Cheraw & Coal Fields Railroad Company start?

I find that this right of way started from the point where this railroad entered the right of way of the Cheraw & Darlington Railroad, and from that point its right of way began 100 feet wide, and that the right of way did not extend to include the property of Rachel Baker. The maps, or plats, introduced by the plaintiff, show that

on the south side of the railroad its right of way stopped where it entered that of the Cheraw & Darlington Railroad. If the curved line showing a right of way on the north side should be allowed, it seems to me that the line should be extended on the south side to include land on that side of the old Cheraw & Darlington right of way. I do not think that it can be contended that the Cheraw & Coal Fields Railroad acquired any of the right of way belonging to the old Cheraw & Darlington, and I conclude and hold that the starting point of the Cheraw & Coal Fields Railroad was at the point where it entered the right of way of the Cheraw & Darlington Railroad and extended no further, and therefore that the property of Rachel Baker, the defendant, was not included in the right of way obtained under the charter.

I find further that there is no evidence to show that the plaintiff acquired this land in any other way than by its charter, and therefore I conclude that the land does not belong to the plaintiff.

It is therefore ordered, adjudged, and decreed that the plaintiff is not the owner of, nor entitled to possession of, the land involved in this action, and that the complaint should be dismissed, and it is so ordered. The exceptions to the Master's report which support the above findings are sustained, and those exceptions which do not support the above finding are overruled.

*Messrs. Pegues & Murray,* for appellant, cite: *Admission of testimony in reference to lost deeds:* Sec. 746–748, Code; 109 S. C., 444; 25 L. R. A. (N. S.), 67. *Railroad company can acquire land under its charter:* 79 S. C., 281; Id., 381; 72 S. C., 288. *Continuity essential to adverse possession:* 1 R. C. L., 716, 717, Sec. 30; 105 S. C., 340. *Where one proves legal title to premises that one is presumed to have been in possession thereof for ten years:* Sec. 320, Code; 71 S. C., 322; 104 S. C., 387. *Appellant*

*entitled to permanent injunction restraining the invasion of
its possession:* 91 S. C., 468; 86 S. C., 358; 131 S. C., 387.

*Messrs. R. E. Hanna* and *George K. Laney,* for respondent.

October 28, 1927.

The opinion of the Court was delivered by Mr. Justice
Blease.

For the reasons therein assigned, the decree of his Honor,
Judge Dennis, which will be reported, is affirmed.

Mr. Chief Justice Watts and Mr. Justice Stabler
concur.

Mr. Justice Cothran (dissenting) : I think that the
decree of his Honor, Judge Dennis, should be reversed, and
the report of the Master confirmed; and therefore dissent
from the contrary conclusion announced in the opinion of
Mr. Justice Blease, for the reasons which follow.

The action was commenced by the service of summons
and complaint on August 27, 1924, and is one seeking
permanently to enjoin the erection of a building, to be used
as a garage and filling station, upon property alleged to be a
part of the right of way of the Atlantic Coast Line Railroad Company.

The defendant answered, denying the principal allegations of the complaint, and alleging, as defenses, adverse
possession, estoppel, laches, and non-user on the part of
plaintiff.

On motion duly noticed, his Honor, Judge Dennis, on the
25th day of October, 1924, ordered that all issues arising
herein, save and except the issue of estoppel, he referred to
the Master of Chesterfield County, to take the testimony and
report to the Court his conclusions on all issues of law and
fact. The issue of estoppel was ordered tried by a jury
(which has not been done).

On March 30, 1925, the Master filed his report, in which
he found that the land in question was owned by the plain-

tiff as a right of way; that plaintiff was in possession of same; that the defendant was attempting to invade plaintiff's possession of the premises, and recommended that defendant be permanently enjoined from so doing.

Defendant duly excepted to the report of the Master, and, after hearing the exceptions to such report, his Honor, Judge Dennis, by his decree filed July 28, 1925, held, in substance, that neither plaintiff nor defendant had proven any adverse possession; *that plaintiff had a right of way under its charter 100 feet wide on each side of the railroad measured from the center of the track,* on what was the old Cheraw & Coal Fields or Cheraw & Salisbury Railroad Company (now the north leg of the Atlantic Coast Line Railroad Company's Y); but that said right of way did not include the property where Mrs. Baker is building the garage, and reversed the findings of the Master upon this point. The decree of Judge Dennis refuses the permanent injunction, and orders that the complaint be dismissed. From this decree the plaintiff appeals.

The elaborate and most excellent report of J. E. Leppart, Esq., Master, will be incorporated in the report of the case. It gives a full and detailed statement of the facts, which renders it unnecessary for me to repeat them.

In the decree of his Honor, Judge Dennis, which will also be reported, he sustains the findings and conclusions of the Master, except in three particulars: (1) In the admission of the testimony of the witness Godfrey, which is held inadmissible; (2) he holds that there is no evidence tending to show that the railroad company acquired the right of way in any other manner than by its charter; and (3) he holds that the land upon which the encroachment alleged is threatened is not within the right of way of the railroad company. This last he considers "the vital question in this case," to which I entirely agree. I do not consider it necessary to discuss any other point in the appeal, for it is apparent that, if the encroachment is within the charter right

of way, as shown in the report of the Master, the plaintiff is entitled to the relief prayed for, unless the defense of estoppel, which his Honor reserved for trial by a jury, should be sustained.

His Honor, Judge Dennis, held:

"I find that the Statutes of North Carolina were properly admitted in evidence and show that a right of way of 100 feet from the center of each side was the right of way of the Cheraw & Salisbury Railroad."

There is no exception to this finding, and it must be taken as a fact that the Cheraw & Salisbury Railroad Company acquired a right of way of 100 feet on each side of the railroad, measuring from the center of the track, to which right the Atlantic Coast Line Railroad Company has succeeded. It must be conceded that this measurement *must be made at right angle to the center of the track,* at every point.

There would not be the slightest difficulty in defining the limits of this right of way, if the question was not complicated by the existence of a prior and superior right of way in the Cheraw & Darlington Railroad Company.

The situation is peculiar. From the accompanying sketches it will be seen that the Cheraw & Darlington Railroad runs practically due north and south at this point. It had acquired a right of way 65 feet on each side of the railroad, measuring from the center of the track, at right angle of course at every point. The Cheraw & Salisbury Railroad (formerly known as the Cheraw & Coal Fields Railroad), with its right of way of 100 feet on each side of the railroad, measuring from the center of the track, at right angle, of course, at every point, approaches the Cheraw & Darlington Railroad from the west, upon a curve, and makes connection with it, at the switch point marked A on the sketch. The lines upon the sketch show the limits of the right of way of the Cheraw & Darlington Railroad 55 feet on the east and 65 feet on the west; and also the limits as

claimed by the plaintiff, of the right of way of the Cheraw & Salisbury Railroad, 100 feet on the south and 100 feet on the north, except where the 100 feet on the north would impinge upon the prior right of way of the Cheraw & Darlington Railroad.

I quote from the decree:

"I find that this right of way *started from the point where this railroad entered the right of way of the old Cheraw & Darlington Railroad,* and from that point its right of way began 100 feet wide, and that the right of way did not extend to include the property of Rachel Baker. The maps, or plats, introduced by the plaintiff show that on the south side of the railroad its right of way stopped where it entered that of the Cheraw & Darlington Railroad. If the curved line showing a right of way on the north side should be allowed, it seems to me that the line should be extended on the south side to include land on that side of the old Cheraw & Darlington right of way. I do not think that it can be contended that the Cheraw & Coal Fields Railroad acquired any of the right of way belonging to the old Cheraw & Darlington, and I conclude and hold that the starting point of the Cheraw & Coal Fields Railroad was at the point where it entered the right of way of the Cheraw & Darlington Railroad, and extended no further, and therefore that the property of Rachel Baker, the defendant, was not included in the right of way obtained under the charter."

The vice in the decree of his Honor, Judge Dennis, I think lies *in measuring the 100 feet right of way of the Cheraw & Salisbury Railroad, along the west line of the right of way of the Cheraw & Darlington Railroad,* instead of at right angle to the center of the track of the Cheraw & Salisbury Railroad. There can be no greater reason for adopting the angle selected by his Honor, at the point where the Cheraw & Salisbury Railroad enters the right of way of the Cheraw & Darlington Railroad, than at any other point on the Cheraw & Salisbury Railroad; and it is apparent, by

the eye, that, if the acute angle should be adopted at all other points, the right of way would be less than 100 feet on each side of the track.

The plaintiff does not contend that the right of way of the Cheraw & Salisbury Railroad extends over any part of the right of way of the Cheraw & Darlington Railroad, either north or south of its center line, but it contends that it is entitled to 100 feet on each side of the center of its track, down to the switch point A, measured at right angle, except where such right of way would impinge upon the prior right of way of the Cheraw & Darlington Railroad. The result would be that on the south side of the Cheraw & Salisbury Railroad, its right of way would terminate at the west line of the right of way of the Cheraw & Darlington Railroad, but that, on the north side, it would include all of the land 100 feet on each side of the center of the track, down to the switch point A, measured at right angle, except that part included within the right of way of the Cheraw & Darlington Railroad. As to this contention I have no doubt but that the plaintiff is right, and, if so, the encroachment, indicated by the letter X, is within the limits of the right of way of the plaintiff.

His Honor held that the right of way of the Cheraw & Salisbury Railroad was limited on both sides by the west line of the right of way of the Cheraw & Darlington Railroad. It is obvious that there is a part of the right of way on the north side, lying between the right of way line of the Cheraw & Darlington Railroad and the limit of the 100 foot line, which extends as far as the point W, 100 feet from the point A, to which the plaintiff is entitled.

As a matter of fact (not involved in this controversy), the right of way of the Cheraw & Salisbury Railroad would include also a small triangle on the east of the Cheraw & Darlington Railroad, beginning at a point 65 feet from the switch point A; thence at right angle with the center of the track 35 feet, to a point on the east side corresponding with

the point W on the west; thence with the right of way line of the Cheraw & Salisbury Railroad to where it would touch the right of way of the Cheraw & Darlington Railroad; and thence with the right of way line of that railroad, to the beginning.

For the purpose of demonstration I append three sketches, substantially corresponding with the plats in evidence.

The following sketch No. 1 shows what the right of way of the Cheraw & Salisbury Railroad would be had there been no complication involving the right of way of the Cheraw & Darlington Railroad:

A - POINT OF SWITCH
B - EAST TERMINUS OF RIGHT OF WAY OF C.& S. R.R.
W - WEST    "    "    "    "    "    "    "    "    "

The following sketch No. 2 shows the right of way of the Cheraw & Darlington Railroad without reference to that of the Cheraw & Salisbury Railroad:

The following sketch No. 3 shows the right of way of the Cheraw & Salisbury Railroad as affected by the prior right of way of the Cheraw & Darlington Railroad:

The right of way of the Cheraw & Salisbury Railroad, of 100 feet on each side of the railroad, measuring, at every point, at right angle to the center of the track, *is perfectly good against all the world, except the Cheraw & Darlington Railroad Company.* As to that company, the right of way of the Cheraw & Salisbury Railroad is overlaid by the 65 feet right of way of the Cheraw & Darlington Railroad, leaving the remainder unaffected by the latter right of way or by the claims of the defendant or of any one else; *that remainder is the part upon which the alleged encroachment has been made.*

It thus appears quite clearly to me that the alleged encroachment is, beyond question, upon a part of the right of way of the Cheraw & Salisbury Railroad. Let these sketches be incorporated in the report of the case.

### On Petition for Rehearing

*PER CURIAM.* Rehearing denied.

Mr. Justice Cothran (dissenting from dismissal of petition) : I respectfully and earnestly submit that the leading opinion has misapprehended the point in the case; namely, that the railroad company, succeeding to the rights of the Cheraw & Salisbury Railroad, is entitled to a right of way of 100 feet, measuring at right angle from the center of the track, at the switchpoint, which will extend beyond the 65 feet right of way of the Cheraw & Darlington Railroad, and will include the land upon which the defendant's garage is located. The railroad company having acquired the rights of both of these companies, there is no conflict between the respective rights of way; and it follows that, at the switchpoint, the railroad company has a right of way of 100 feet on each side of the center of the track, measuring at right angle, which necessarily will include the disputed area.

I think therefore, that the petition should be granted.